UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| ANTHONY WATKINS, individually and as parent of NW, | ) ) ) | |
| Plaintiff | ) ) | |
| v. | ) ) | Civil No. 04-211-B-H |
| LOVLEY DEVELOPMENT INC., d/b/a Dunkin Donuts, | ) ) ) | |
| Defendant | ) ) | |

*Amended [1] Recommended Decision on Motion for Summary Judgment*

Anthony Watkins claims that he and his five-year-old son were denied service at the Old Town, Maine, Dunkin Donuts on March 18, 2004, by employee Susan Marshall because he and his son are African-American. The service encounter ended when Marshall called the police. Marshall claims that she did not serve Watkins before other customers because he and his son were standing at a register that was closed. Insisting that Marshall's true motivation was racial prejudice, Watkins's complaint includes one count under 42 U.S.C. § 1981 and § 1982 which charges Lovley Development Inc., the Maine corporation doing business as Dunkin Donuts, with interfering with his ability to enter into a contract for the purchase of food and/or drink because of his race. It also has a second count under the Maine Human Rights Act for the refusal of service due to race. Lovley Development Inc. has filed a motion for summary judgment. (Docket No. 16.) Because the defendant has failed to carry its burden of production so as to entitle it to

---

[1] There are only two amendments. On page 3, last paragraph "indicted" is corrected to be "indicated", and on page 10, the last sentence of the final paragraph in Footnote 5 is corrected.

judgment as a matter of law on the federal civil rights counts and because it argues that its entitlement to judgment on the state law claim should be judged by the same standard, I recommend that the court deny its motion as to both counts.

### *Discussion*

In analyzing this motion, I "'constru[e] the record in the light most favorable to the nonmoving party and resolv[e] all reasonable inferences in that party's favor.'"  Braga v. Genlyte Group, Inc., 420 F.3d 35, 38 (1st Cir. 2005) (quoting Whitlock v. Mac-Gray, Inc., 345 F.3d 44, 45 (1st Cir.2003)).  The Court can grant Lovley Development's summary judgment motion only if the record establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); accord Braga, 420 F.3d at 38.  In a case such as this which involves a 'he says, she says' tug-of-war, I am mindful that the Court "may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); see also id. at 150-51 ("'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"  [Anderson v.] Liberty Lobby, [477 U.S. 242,] 255 [(1986)].").

### *Material Facts*

Defendant Lovley Development, Inc. owns and operates a Dunkin Donuts located in Old Town, Maine.  (Def.'s SMF ¶ 1.)  On March 18, 2004, the Old Town Dunkin Donuts was staffed by two employees, Susan Marshall and Alicia Day, rather than the normal three employees. (Id. ¶ 2.)

Anthony Watkins and his five-year-old son are African-American. (Pl.'s SAMF ¶ 25.)  On March 18, 2004, Watkins and his son entered the Old Town Dunkin Donuts.

(Def.'s SMF ¶ 3.)  This Dunkin Donuts has two registers located in the front of the shop separated by a coffee wall and a register in the rear of the shop located next to the drive-thru window. (Id. ¶ 4.)

When Watkins and his son entered the Dunkin Donuts Susan Marshall was taking orders and serving customers from the front counter while Alicia Day was taking orders and serving customers from the drive-thru window.  (Id. ¶ 5.)  Watkins and his son approached the service counter and proceeded to stand at what is referred to as the left register, which was not staffed by an employee, (id. ¶ 6), although according to Watkins at the time he and his son approached the register they did not know the register was not staffed, (Pl.'s Resp. SMF ¶ 6) as he thought an employee was working both registers because there were two employees behind the counter (Pl.'s SAMF ¶¶ 26, 27).

There is no dispute that the register staffed by Susan Marshall, and referred to as the right register, had two customers waiting in line to be served. (Def.'s SMF ¶ 7.) According to the defendant, while waiting on a customer Marshall indicated to Watkins twice that the register he was standing at was closed (id. ¶ 8) and Marshall asserts that it was only a few seconds after Watkins had been standing at the unattended register before she said, "I am sorry there is no one working this register at the time," at which point Marshall proceeded to make a frozen drink for the customer on whom she was already waiting (Def.'s Reply PSAMF ¶¶ 28,29, 30; Marshall Dep. at 27).

Watkins's version of these facts is different.  He asserts that Marshall indicated the line was closed only after Watkins had been ignored for six to seven minutes and he had expressly asked for help.  (Pl.'s Resp. SMF ¶ 8; Pl's SAMF ¶¶ 28, 29.)  He claims that

3

when he asked for help Marshall told him that no one was working at that register and she continued to go elsewhere. (Pl.'s SAMF ¶ 30.)

According to the defendant, despite notice to Watkins that the register at which he was standing was closed Watkins continued to stand in the vicinity of the closed register and request that Marshall take his order. (Def.'s SMF ¶ 14.)  Watkins qualifies this statement, indicating again that he was only verbally notified by Marshall after he was ignored for six to seven minutes.  (Pl.'s Resp. SMF ¶ 14.)

Both parties agree that there was no sign on the cash register to indicate to customers that the register was closed (Def.'s SMF ¶ 9) and that when Watkins asked Marshall what was available to indicate why the register was not open, Marshall responded that she notified him of this fact by telling him that there was no one working at that register (Pl.'s SAMF ¶ 32).

According to Watkins, he then asked for the owner's phone number (Pl.'s SAMF 33) and Marshall responded that she did not have time to get him the number because she was assisting other customers (id. ¶ 34).  According to Marshall, Watkins asked to speak with the manager (Def.'s Reply Pl.'s SAMF ¶ 33) and she told Watkins that the store manager was gone for the day (id. ¶ 34).

There is no dispute that when Watkins was unable to place his order at the closed register he became frustrated and expressed his desire to place his order regardless (Def.'s SMF ¶ 15; Pl.'s Resp. SMF ¶ 15 ) and that his requests for service were in a loud voice (Def.'s SMF ¶ 16).  Watkins adds that he spoke in a loud voice so that he could be heard above the volume of two television sets in the lobby.  (Pl.'s Resp. SMF ¶ 16; Pl.'s SAMF ¶ 47.)

There is no dispute that Watkins asked another customer if he could move in line in front of that customer a request to which the customer agreed. (Pl.'s SAMF ¶ 35; Def.'s Resp. SAMF ¶ 35.)  According to Watkins he then asked Marshall if she would take his order to which she responded that she wanted him to leave the store. (Pl.'s SAMF ¶ 36.) He states that Marshall continued to look past him and asked other customers to take their orders by addressing them as "sir" or "ma'm," (id. ¶ 37) but that Marshall never addressed Watkins as "sir" (id. at 38.  Watkins reports that Marshall had waited on three other customers behind Watkins and Watkins asked her again if she would take his order. (Id. ¶ 39.)

The defendant denies these statements citing to two pages of Marshall's deposition testimony.  On those two pages Marshall reports:  "At one point in time before I had completed the second customer who was already in the store, the whole line kind of shifted aside for me to take his order when his turn came.  But he wouldn't give me his order; he just kept yelling at me."  (Marshall Dep. at 32.)  Marshall claims in her deposition testimony that Watkins never got in front of the line on the first register which she was working but moved to a space "along the coffee wall" between the two registers. (Id. at 29, 32.)  She indicates that she did not take his order because there were still two other people whose orders she had to finish with that were in the store prior to Watkins's arrival.  (Id. at 29.)     There is no dispute that all of the other customers in line were Caucasians.  (Pl.'s SAMF ¶ 40.)

According to the defendant, despite requests from Marshall that Watkins refrain from speaking in a loud voice and disrupting the shop he continued to do so. (Def.'s SMF ¶ 17; Def.'s Reply Pl.'s SAMF ¶ 41)  She reports that Watkins said he would not leave

and that she continued to state that if he persisted she would have to call somebody to get him to leave.  (Def.'s Reply Pl.'s SAMF ¶ 41.)  According to Marshall, Watkins's disruptive actions caused her to call the police.  (Def.'s SMF ¶ 18 .)

     Watkins disputes Marshall's characterization of this stage in the interaction by citing to deposition testimony by Watkins, Alicia Day, and Susan Marshall, and the affidavit of Frank Dumond.  (Pl.'s Resp. SMF ¶¶ 17,18; see also Pl.'s SAMF ¶ 41.)[2]  In the portion of his deposition cited to Watkins indicates:

> I wanted to know if there were any other people who had any disagreements with store employees that had the police called on them.  And if that is the case – and I used no profanity.  I didn't insult anyone.  And I spoke loudly enough to be heard to someone who was far away and stayed in motion and was ignoring me.  And that was loud.
> And I never endangered anyone.  There were no threats.  There was nothing about me and my son which would have indicated that the people in the store were in danger.

(Watkins Dep. at 31.)

     Day testified that she was standing about twenty feet from the front counter and that at no time did she think that she might have to get involved in the situation.  (Day Dep. 13.)  Day explained:

> Well, like I said, the first thing I saw was her saying that that register wasn't open and that he needed to be in the other line.
> And then I remember him saying something about there not being a sign telling him not to go to that register.  And he didn't want to go to the back of the line because he was there before them.
> And she said that she would wait on him when it was his turn.  I just caught bits and pieces of it, basically.  And I heard her say that if he kept yelling, that she would call the police and wouldn't serve him.  And she did eventually call the police.

---

[2]    Both sides of this dispute have employed this annoying shortcut of offering a simple "deny" or "qualify" and then citing to the record without explication of how they mean the portions of the record to deny or qualify the assertion.  Although I have not been so severe as to completely ignore the denial or qualification, the parties must live with the results of my mind-reading efforts.

(Day Dep. at 13.)  At her deposition Day indicated that there were about ten other customers in the Dunkin Donuts at the time and that none of these customers complained about the disruption, although after the incident was over "they were just saying how ridiculous it was that he had made such a big deal of it."  (Id. at 15.)   In the referenced portion of the Marshall deposition Marshall indicates she did not recall any of the customers doing anything or saying anything that suggested to her that they were uncomfortable about the situation.  (Marshall Dep. at 31.)   Finally, Fran Dumond, who was a customer at the store at the time of the incident states that in his opinion at no time did he observe Watkins cause any disruption that would justify calling the police or refusing to serve him.  (Dumond Aff. ¶ 13.)

Watkins contends that Marshall was unfriendly, hostile, and dismissive to Watkins from the beginning.  (Pl.'s SAMF ¶ 43.)  He says that at no time did Marshall ever offer to serve him, (id. ¶ 44) and that Marshall would not look at Watkins even when she spoke to him (id. ¶ 45).[3]

---

[3]       The defendant responds by citing to portions of Day's and Marshall's depositions without specifying how the cited pages deny Watkins's statements.(Def.'s Reply Pl.'s SAMF ¶¶ 43-45, 47.)  As to Paragraph 43 of Watkins's statement of additional fact, the defendant responds: "Denied. (S. Marshall Deposition, pp 24-37); (Alicia Day Deposition, p. 20.)  Discerning the precise nature of the denial from fourteen cited pages of testimony may be beyond my abilities.

       Much of the record cited to is redundant of the defendant's summary judgment facts.  Day reports that Marshall was "just saying, sir, you need to calm down or I don't have to serve you." (Day Dep. at 20.)  She recalls that Watkins's tone of voice "was very loud and everybody in the lobby was kind of stopped and looking and didn't know what was going on." (Id.)  She heard Marshall say that if Watkins kept yelling she would call the police and would not serve him.  (Id. at 13.)  Day reports that the volume on the television was not loud enough to distract and that they were placed there for "customers that were enjoying their purchase inside the store." (Id. at 19-20.)

       Marshall's version of the exchange is that, after she served another customer,  she was polite, saying, "[S]ir, I'm sorry there is no one working this register right now" thinking that Watkins had not heard her the first time. (Id. ¶ 27.)  When Watkins asked why they did not have signs to indicate a closed register, Marshall claims she again said she was sorry but that was the procedure they used, at which point Watkins began yelling at her.  (Id.)  She told him that she would get to him in his turn which would have been "after the second lady." (Id. at 27-28.)  She states that she never told Watkins to get to the end of the line.  (Id. at 28.)  She claims that when the other customers shifted aside to allow Marshall to take Watkins's order he would not give her his order but "just kept yelling" at her.  (Id. at 32.)   Marshall

There is no dispute that Watkins never insulted anyone, he did not make any threat, and he did not use profanity (Pl.'s SAMF ¶ 48); that none of the customers complained to Alicia Day about any disruption (id. ¶ 49); that Day never thought she might have to get involved (Id. ¶ 50); and that Watkins waited in the store with his son until the police arrived (id. ¶ 51).  There is also no dispute that Watkins was not arrested or charged with a crime.  (Id. ¶ 54.)

According to the defendant, Watkins remained in the shop in the vicinity of the closed register from which he demanded service until the police arrived.  (Def.'s SMF ¶ 19.)  According to Watkins he had moved into the "correct" or open line where he was again refused service.  ( Def.'s Resp. SMF ¶ 19; Watkins Dep. at 31; Day Dep. at 13, 15; Marshall Dep. at 31; Dumond Aff. ¶ 13.)

Watkins contends that none of the customers were uncomfortable with the situation that had arisen (id. ¶ 52) and that he did not cause any disruption that would justify calling the police or refusing to serve him (id. ¶ 53).  The defendant counters that Watkins's tone of voice was very loud and that everybody in the lobby stopped and looked, unsure of what was going on.  (Day Dep. at 20.)  Day reports that when the confrontation first started she had a drive-up customer who asked what was going on in the store to which Day replied that a customer was upset for some reason.  (Id. at 21.)  Marshall contends that Watkins persisted to yell and scream at her even though she asked him to stop.  (Marshall Dep. at 30.)

According to Watkins on other visits to the Old Town Dunkin Donuts store, he had received service from employees other than Marshall even though he may have been

---

indicates that the television volume was about midway and that it would not have interfered with normal conversation.  (Id. at 30.)

at a register that might be closed. (Id. ¶ 56.)[4]  Following the incident, Watkins called the

corporate office of the Old Town Dunkin Donuts and left a message for the owner to call

him. (Id. ¶ 57.) The owner of the Dunkin Donuts store never called Watkins to address

Watkins's concerns. (Id. ¶ 58.)

There is no dispute that in recalling the event Watkins states that the incident in

question was partially the result of an understaffed shop. (Def.'s SMF ¶ 20.)  Nor is there

a dispute that in recounting the incident in question to his wife Anthony Watkins

wondered if the interaction with Susan Marshall involved race.  (Id. ¶ 21.)  During the

entire incident in question Marshall never made any rude, offensive, or disparaging

comments to Watkins (id. ¶ 22), although Watkins describes Marshall as having been

"unfriendly, hostile, and dismissive" towards him (Pl.'s Resp. SMP ¶ 22).[5]

---

[4]     The defendant denies this assertion by citing portions of the Day and Marshall deposition testimony that do not controvert Watkins's assertion about his prior experience with employees other than Marshall.  (See Marshall Dep. at 13-14; Day Dep. at 10.)

[5]     In Watkins's experience, racial discrimination may be displayed through hostility toward rendering of service, indifferent attitudes, refusals of service, and calls for police assistance. (Pl.'s SAMF ¶ 59.) There is no dispute that Watkins believes that Marshall may have a problem dealing with African-Americans. (Id. ¶ 46.)

        In Alexis v. McDonald's Restaurants of Massachusetts, Inc., 67 F.3d 341 (1st Cir. 1995) the First Circuit addressed a similar 42 U.S.C. § 1981 claim by a plaintiff attempting to obtain service from a McDonalds Restaurant. The plaintiff was relying on depositions of people who had observed the McDonald employee, Donna Domina, in question.  The First Circuit reasoned:

> The six deponents based their inferences of racial animus on their personal observations that Domina reacted "angrily" toward Alexis and with "a negative tone in her voice," was "unfriendly," "uncooperative," "high strung," "impolite," "impatient," and had "no reason" to eject Alexis. Although these observations may be entirely compatible with a race-based animus, there simply is no foundation for an inference that Domina harbored a racial animus toward Alexis or anyone else, absent some probative evidence that Domina's petulance stemmed from something other than a race-neutral reaction to the stressful encounter plainly evidenced in the summary judgment record, including Alexis's persistence (however justified). As the depositions disclosed no evidentiary foundation for an inference of racial animus, the conclusory lay opinions were properly excluded.

Id. at 347.  "As Alexis points to no competent evidence that Domina and McDonald's intentionally discriminated against her on account of her race," the Panel concluded, "the district court correctly ruled that this section 1981 claim was not trialworthy."  Id. at 347-48.

        The Second Circuit "followed" Alexis  in Hester v. B.I.C. Corp. concluding that Federal Rule of Civil Procedure 701(b) bars such testimony "that amounts to naked speculation" as to the motivations for, in its case employment, discrimination.  225 F.3d 178, 185 (2d Cir. 2000).  However it indicated:

As an employee of the Old Town Dunkin Donuts, Susan Marshall was required to attend job training prior to and during her employment. (Def.'s SMF ¶ 23.) The job training she received concerned product preparation, customer service, safety, and the company non-discrimination policy. (Id. ¶ 24.)  There is no dispute that Dunkin Donut employees were trained to work a customer into sequence if they were at a closed register, as opposed to telling them to go to the end of the line. (Pl.'s SAMF ¶ 31.) There is also no dispute that it is Dunkin Donuts' policy to ask customers at closed registers to move to an open register to place their order (Def.'s SMF ¶ 10); it is Dunkin Donuts' policy to have employees use their assigned registers and cash drawers throughout their shift and not to use unassigned or closed registers (id. ¶ 11); it is not Dunkin Donuts' policy to take orders or accept payment for orders at registers that are not open (Id. ¶ 12); and it is Dunkin Donuts' policy to help customers in the order they enter the store (id. ¶ 13.).[6]

### Federal Claims

In the paragraph entitled "Statement of equal rights," section 1981 of title 42 of the United States Code provides:

---

Witnesses are free to testify fully as to their own observations of the defendant's interactions with the plaintiff or with other employees, but 'the witness's opinion as to the defendant's [ultimate motivations] will often not be helpful within the meaning of Rule 701 because the jury will be in as good a position as the witness to draw the inference as to whether or not the defendant' was motivated by an impermissible animus.

Id.  (quoting United States v. Rea, 958 F.2d 1206, 1216 (2d Cir. 2000)).

Watkins, unlike Alexis, bases his prima facie case of racial discrimination on a comparison between himself and similarly situated white customers as discussed herein.  Accordingly, the present case does not turn on Watkins's opinion regarding racial animus nor does it turn on the opinion of any other witness.  For purposes of this summary judgment motion, the evidence of racial animus, scant though it may be, arises from plaintiff's prima facie case established under the McDonnell Douglas/Burdine framework.

[6]     Watkins adds that he did not know that these were the store's policies at the time. (Pl.'s Resp. SMF ¶¶ 10-13; Pl.'s SAMF ¶ 55.)  However, this is not material to the defendant's liability under the federal or state civil rights laws.

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).  The  second paragraph, defines "make and enforce contracts": "For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." § 1981(b).

"All citizens of the United States," section 1982 provides, "shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982 Apropos the § 1982 overlay of this count:  "Both §§ 1981 and 1982 derive their operative language from the first section of the Civil Rights Act of 1866. Because of their common origin and purpose, § 1981 and § 1982 are generally construed in tandem." Morris v. Office Max, Inc., 89 F.3d 411, 413 (7th Cir. 1996) (citing Tillman v. Wheaton-Haven Recreation Ass'n, Inc., 410 U.S. 431, 440 (1973) and Southend Neighborhood Improvement Ass'n v. County of St. Clair, 743 F.2d 1207, 1210-11 (7th Cir.1984)). Whether or not there might be an argument that in some instances § 1982 might be a vehicle when there was a want of a § 1981 "contract" underlay to a claim and whether or not what Watkins intended to purchase is the type of personal property covered by § 1982, I need not decide; both parties have briefed this motion on the basis of case law interpreting § 1981.

In <u>Garrett v. Tandy Corporation</u>, a case from this District containing a 42 U.S.C. § 1981 claim involving an electronics retail establishment, the First Circuit Court of Appeals surveyed the law in other circuits with respect to racial discrimination claims of this ilk.  295 F.3d 94, 98 -103 (1st Cir. 2002).  Affirming this Court's disposition of the claim, the Panel set forth the Seventh Circuit's <u>Morris v. Dillard Dep't Stores, Inc.</u>, statement-of-claim standard:  "To state a claim under this statute, a plaintiff must show (1) that he is a member of a racial minority, (2) that the defendant discriminated against him on the basis of his race, and (3) that the discrimination implicated one or more of the activities enumerated in the statute."  295 F.3d at 98 (citing <u>Morris v. Dillard Dep't Stores, Inc.</u>, 277 F.3d 743, 751 (5th Cir.2001)).  <u>See also</u> <u>Hampton v. Dillard Dep't Stores, Inc.</u>, 247 F.3d 1091, 1101-02 (10th Cir.2001).

There is no dispute that Watkins and his son are members of a racial minority. And, unlike the situation in <u>Garrett</u>, this case does not turn on whether or not the alleged discrimination implicated one or more of the activities enumerate in 42 U.S.C. § 1981(b). "The critical question," in <u>Garrett</u> was "whether the facts alleged in the appellant's complaint, taken in the light most flattering to his theory of the case, show[ed] a sufficient nexus between the asserted discrimination and some contractual right or relationship."  295 F.3d at 98.  Vis-à-vis Watkins's claim there is no sound argument that refusing to serve Watkins did not interfere with his ability to 'make a contract' to purchase a beverage and or food item from Dunkin Donuts; he could not even get to the point of asking for something from the menu.[7]

---

[7]    The cases from the other circuits examined by <u>Garrett</u> turned on the third prong inquiry of whether there had been an attempt of the consumer to contract with the establishment. This was true for the Seventh Circuit case described by the <u>Garrett</u> Panel as the "preeminent case," <u>see</u> <u>Morris v. Office Max, Inc.</u>, 89 F.3d at 414 (rejecting § 1981 contract claim when defendant denied plaintiffs "neither admittance nor

Rather, the future of this count turns on whether or not the facts in this record, viewed in a light most favorable to Watkins, create a genuine dispute about whether Marshall's interference with Watkins's attempts to contract was based on race.  This is not a case where there is any evidence that Marshall used language indicative of racial animus before, during, or after, see, e.g., Leach v. Heyman, 233 F.Supp.2d 906, 909-11 (N.D. Ohio 2002).  As Watkins presents no direct evidence of this motivation, he concedes that his case is built upon circumstantial evidence of racial bias.  (See Pl.'s Mem. Opp'n Mot. Summ. J. at 8.)

Apropos a non-employment 42 U.S.C. § 1981 public bidding decision claim, the First Circuit has held that the McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973) and Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981) standard applies to non-employment 42 U.S.C. § 1981 attempt-to-contract claims. See T & S Serv. Assocs., Inc. v. Crenson, 666 F.2d 722, 724-28 (1st Cir. 1981).  The Second,

---

service, nor were they asked to leave the store"), and for the other decisions dissected in Garrett, see Morris v. Dillard Dep't Stores, 277 F.3d at 746-47, 751-53 (concluding that plaintiff did not "offer evidence of some tangible attempt to contract" "which could give rise to a contractual duty between her and the merchant, and which was in some way thwarted"); Youngblood v. Hy-Vee Food Stores, Inc., 266 F.3d 851, 853-54 (8th Cir.2001) (determining that the plaintiff who had already consummated the purchase prior to the alleged discriminatory conduct could not pursue § 1981 relief because after the purchase was complete "neither party owed the other any duty under the retail-sale contract"); Hampton, 247 F.3d at 1103-07, 1117-18 (upholding jury verdict for one plaintiff based in part on a conclusion that there was an attempt to contract and upholding summary judgment adverse to second plaintiff on ground she had not attempted to make a contract); see also Arguello v. Conoco, Inc., 330 F.3d 355, 358 -61 (5th Cir. 2003); Bagley v. Ameritech Corp., 220 F.3d 518, 519 -22 (7th Cir. 2000).
     The Garrett Panel indicated that it was "not comfortable with all of these outcomes" and would not "make a wholesale endorsement of the reasoning employed by these courts." 295 F.3d at 100.  It reasoned however, that "the doctrinal rule established in these cases seems sound, even if the application of the rule is questionable." Id.  One of the cases that concerned the Panel was Morris v. Dillard Department Stores, in which the defendant store had banned the plaintiff from the store after it suspected her of shoplifting because the plaintiff did not present evidence that she had attempted to return to the store during that ban, 277 F.3d at 751; the First Circuit viewed this conclusion as "problematic." 295 F.3d at 100.  In this passage the Panel also referred positively to Christian v. Wal-Mart Stores, Inc., 252 F.3d 862 (6th Cir.2001) and its explanation "that, in a 'commercial establishment' context, liability will attach when a plaintiff 'receive[s] services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory.'" 295 F.3d at 100 (citing Christian, 252 F.3d at 872).   In view of this sentiment in Garrett I am confident that the First Circuit would conclude that Watkins had attempted to contract with Dunkin Donuts when he presented himself at the left register.

13

Lizardo v. Denny's, Inc., 270 F.3d 94, 101-05 (2d Cir. 2001), the Fourth, Williams v. Staples, Inc., 372 F.3d 662, 667-68 (4th Cir. 2004); Murrell v. Ocean Mecca Motel, Inc., 262 F.3d 253, 257 (4th Cir. 2001), the Sixth, Christian v. Wal-Mart Stores, Inc., 252 F.3d 862, 868 (6th Cir. 2001), the Ninth, Doe v. Kamehameha Schools/Bernice Pauahi Bishop Estate, 416 F.3d 1025, 1034-39 (9th Cir. 2005),  and the Tenth, Hampton, 247 F.3d at 1107-08, Circuits have issued published opinions which embrace a McDonnell Douglas/Burdine burden shifting approach apropos non-employment 42 U.S.C. § 1981 claims.  See also Slocumb v. Waffle House, Inc., 365 F.Supp.2d 1332, 1339- 40 (N.D. Ga. 2005).  The Third, Koorn v. Lacey Tp., 78 Fed.Appx. 199, 206-07 (3d Cir. 2003), the Fifth, Daniels v. Advantage Rent-A-Car Inc., 80 Fed.Appx. 936, 939 & n.4 (5th Cir. 2003),[8] and the Seventh, see Stone v. Mid Indiana Serv. Co., Inc., 115 Fed. Appx. 900, 902 (7th Cir. 2004), Circuits have issued unpublished opinions for the most part acquiescing to this approach in the case at hand.

In the Sixth Circuit's Christian the panel articulated the McDonnell Douglas/Burdine, standard in a similar denial of service case:

> Under this standard, a plaintiff must first establish a prima facie case of discrimination by a preponderance of the evidence. The burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. To prevail, the plaintiff must then prove by a preponderance of the evidence that the defendant's proffered reason is not its true reason but a pretext for discrimination. See Reeves, 530 U.S. at 142-43 (applying three-part test in jury trial); Burdine, 450 U.S. at 253, 101 S.Ct. 1089 (applying three-part test in bench trial).

Christian, 252 F.3d at 868.

---

[8]       In footnote four the Panel stated: "Although our research has found no cases in this circuit applying McDonnell Douglas outside the employment context, neither party has challenged the district court's methodology. Therefore, we will assume, for purposes of this appeal, that the district court's methodology was correct."  Id.  The Fifth Circuit actually had a prior unpublished opinion that briefly addressed such a claim/burden. See Jeffrey v. Columbia Med. Ctr. at Lancaster Subsidiary LP, 2002 WL 31016499 (5th Cir. 2002).

Apropos the <u>prima facie</u> case, the Fourth Circuit's <u>Williams</u> Panel applied the following four prongs:

> To establish a prima facie case of discrimination in a § 1981 cause of action relating to the purchase of goods or services, Williams must establish that: (1) he is a member of a protected class; (2) he sought to enter into a contractual relationship with the defendant; (3) he met the defendant's ordinary requirements to pay for and to receive goods or services ordinarily provided by the defendant to other similarly situated customers; and (4) he was denied the opportunity to contract for goods or services that was otherwise afforded to white customers.

372 F.3d at 667. [9]

The Fourth Circuit's <u>Williams</u> reversed the lower court's decision granting the defendant's motion for summary judgment in a case that included the following factual predicate:

---

[9]     <u>Christian</u> embraced the denial of service tailored prima facie standard framed by the District Court in <u>Callwood v. Dave & Buster's, Inc.</u>:

> [I]n order to make out a prima facie case under the circumstances of these cases, plaintiffs must show the following: (1) they are members of a protected class; (2) they made themselves available to receive and pay for services ordinarily provided by the defendant to all members of the public in the manner in which they are ordinarily provided; and (3) they did not enjoy the privileges and benefits of the contracted experience under factual circumstances which rationally support an inference of unlawful discrimination in that (a) they were deprived of services while similarly situated persons outside the protected class were not deprived of those services, and/or (b) they received services in a markedly hostile manner and in a manner which a reasonable person would find objectively unreasonable.

<u>Callwood v. Dave & Buster's, Inc.</u>, 98 F.Supp.2d 694, 707 (D. Md. 2000) (citation omitted). See <u>Christian</u>, 252 F.3d at 870- 73; <u>but see</u> <u>Williams</u>, 372 F.3d at 668 n.5 ("We decline to adopt the <u>Callwood</u> elements in this case. <u>Callwood</u> purports to provide an alternative analytical approach in public accommodation discrimination cases in which there is scant evidence as to how members of the protected class are treated differently from members outside the class. <u>Callwood</u> is not applicable to this case, because there is adequate comparative evidence."); <u>Gilyard v. Northlake Foods, Inc.</u>, 367 F.Supp.2d 1008, 1014 (E.D. Va. 2005) (discussing the different standards for <u>prima facie</u> cases, following <u>Williams</u> rather than <u>Callwood</u>); <u>Slocumb</u>, 365 F.Supp.2d at 1338 n.5 ("This Court has rejected the <u>Christian</u> standard in a directly analogous restaurant accommodation context because " '[t]he test requires a finding of the ultimate issue-- discrimination--and its operative phrase, "markedly hostile manner," is so vague as to be unhelpful ....' " <u>Solomon v. Waffle House, Inc.</u>, No. 03-cv-2797-ODE, 365 F.Supp.2d 1312, 1325, 2004 WL 3314941 at *12 n. 4 (N.D. Ga. Nov. 4, 2004) (quoting <i>Benton,</i> 230 F.Supp.2d at 1378). "[W]ithout guidance from the Eleventh Circuit or the U.S. Supreme Court, this Court declines to expand the traditional prima facie test for racial discrimination." <u>Id.</u>").

        The outcome of this case would be the same under either the Sixth or the Fourth's standard but the Fourth's <u>Williams</u> seems more straightforward.

On the afternoon of June 26, 2001, Williams attempted to purchase a printer cartridge at the Staples office supply and photocopying store in Winchester, Virginia. After finding the cartridge, Williams presented his personal check, which included his pre-printed Maryland address, to a female sales clerk. At the time, Staples had a nationwide policy of accepting all checks (as long as they met certain criteria not material to this case). Clerks were supposed to insert all checks into a device on the cash register, which would electronically verify the checks through a neutral, third-party check guarantee system. Contrary to Staples' policy, the clerk informed Williams that Staples "did not accept out-of-state checks." J.A. 141. Williams offered to show the clerk his Maryland driver's license and his identification card from the nearby university he was attending, but the clerk repeated that Staples could not accept out-of-state checks. Williams left the store without making the purchase.

About three weeks after this incident, Williams had breakfast with several of his university classmates. One of the classmates complained that the Winchester Staples had mishandled his photocopying order. Williams added that he also was dissatisfied with Staples because it refused his out-of-state check. Another classmate, Heather Hutchinson, who is white, replied that she had recently used her out-of-state check-- also from Maryland--at Staples. She later showed Williams the receipt from her transaction. It was dated June 26, 2001, the same day Staples refused to take Williams's out-of-state check.

372 F.3d at 665-66 (footnote omitted).

Apropos the plaintiff's <u>prima</u> <u>facie</u> showing, the Court stated:

We conclude that Williams has adduced sufficient evidence to establish a prima facie case. First, Williams, as an African-American, is a member of a protected class. Second, Williams sought to enter into a contractual relationship with Staples when he attempted to purchase the printer cartridge. Third, Williams met the ordinary requirements to pay for and receive the printer cartridge by offering payment by out-of-state check because, at the time of the attempted transaction, Staples alleges that it maintained a policy of accepting all checks from all customers for processing through its neutral check verification system. Fourth, Williams was denied the opportunity to enter into a contract with Staples even though Staples afforded such an opportunity to a white customer. It is undisputed for purposes of this motion that Staples accepted the out-of-state check of Williams's white classmate on the same day that Staples rejected Williams's out-of-state check.

<u>Id.</u> at 668.   <u>See</u> <u>also</u>  <u>id.</u> at 668 n.6 ("The fact that Williams was served by a different

clerk at a different register does not mean he was not similarly situated for purposes of

establishing a prima facie case. It is sufficient that Williams has established that he presented his check to an agent of Staples and it was rejected while his white classmate also presented her check to an agent of Staples on the same day for similar merchandise and it was accepted.").

With respect to the first <u>Williams</u> prong there is no dispute that Watkins and his son are a member of a protected class; that Watkins sought to enter into a contractual relationship with the defendant; and that he met Dunkin Donuts' "ordinary requirements to pay for and to receive goods or services ordinarily provided by the defendant to other similarly situated customers." 372 F.3d at 667.

Apropos the <u>prima facie</u> case, the defendant solely argues that Watkins has not established that he was treated in a different manner than similarly situated other Caucasian customers.  (<u>See</u> Reply Pl.'s Opp'n Mot. Summ. J. at 2-3.)[10]   It argues:

> In <u>Solomon v. Waffle House, Inc.</u>, 365 F.Supp.2d 1312 (N.D. Ga. 2004), the plaintiffs' group consisted of some African-Americans and some whites, while another group at the restaurant was entirely white. The Court found that the African-American group, was similarly situated with the white group, and were treated in a significantly different way by the Defendant. Similarly, in <u>Callwood et al. v. Dave and Busters, Inc.</u>, 98 F.Supp.2d 694 (D. Md. 2000), the court found that a comparison between "similarly situated members within and outside the class supported an inference of discrimination," and, thereby, a factual basis for the ultimate finding of discrimination." In both cases, the critical element that allowed for an inference of discrimination was the disparate treatment of similarly-situated persons who were white.
>
> Unlike <u>Solomon</u> and <u>Callwood</u>, the Plaintiff has not submitted any evidence to show that the Defendant treated similarly situated individuals in a manner different than they treated the Plaintiff. The undisputed evidence in this case is that the Plaintiff demanded service from a closed cash register after being informed that it was closed, and that he became frustrated and loud. As with any customer acting in this manner, he was refused service and was asked to leave. Plaintiff acknowledges entering the Defendant's establishment, noticing a line at one of the registers and

---

[10]     In the summary judgment motion the defendants do not articulate the <u>prima facie</u> showing.  It is not until its reply that it discusses the standard in response to Watkins's opposition memorandum.

standing in front of the other register. (PSOMF 6). He was informed that
the register was closed. (PSOMF 8). Plaintiff continued to stand at the
closed register. (PSOMF 14). He became frustrated and spoke loudly
when he was told they would not take his order at the closed register.
(PSOMF 15, 16). Plaintiff admits that Defendant's employees did not
make any rude, offensive or disparaging comments. (PSOMF 22). Plaintiff
was told that he would have to leave if he did not stop yelling. (Alicia Day
Deposition p. 13). He informed the Defendant employees that he would
not leave. (S. Marshall Deposition, p. 30, 31). Defendant called the Police
to assist in his removal. (S. Marshall Deposition, p. 31).

Notably, there is no evidence of similarly-situated persons in the
Dunkin Donuts that day, let alone different treatment of those other
persons. No one else insisted on receiving service at a register that was not
open. No one else was verbally confrontational about receiving service,
nor did anyone else disrupt the store. Since there were no whites who
conducted themselves as the Plaintiff did, it would be unfair and
unreasonable to infer that the Plaintiff was treated differently because he
was African-American.

(Id. at 3-4.)

I do not think that the defendant's portrait of the facts in dispute material to this
showing is accurate.  It is true that the defendant asserts that while waiting on a customer
Marshall indicated to Watkins twice that the register he was standing at was closed and
that it was only a few seconds after Watkins had been standing at the unattended register
before she said, "I am sorry there is no one working this register at the time," at which
point Marshall proceeded to attend to another customer's drink order. And, the defendant
contends, despite requests from Marshall that Watkins refrain from speaking in a loud
voice and disrupting the shop he continued to do so and that Watkins said he would not
leave and that she continued to state that if he persisted she would have to call somebody
to get him to leave, which she did.

However, Watkins asserts that Marshall indicated the line was closed only after
Watkins had been ignored for six to seven minutes and after he had expressly asked for
help.  And, there is no dispute that Watkins asked another customer if he could move in

line in front of that customer to which the customer agreed.  According to Watkins he then asked Marshall if she would take his order to which she responded that she wanted him to leave the store. Watkins contends that Marshall continued to look past him and asked other customers who were behind him in line to take their orders by addressing them as "sir" or "ma'm," but that Marshall never addressed Watkins as "sir."   While Marshall never made any rude, offensive, or disparaging comments to Watkins, Watkins describes Marshall as having been "unfriendly, hostile, and dismissive" towards him. Watkins reports that Marshall had waited on three other customers behind Watkins and Watkins asked her again if she would take his order.  Watkins also forwards evidence that at no time did Day think that she might have to get involved in the situation and that there were about ten other customers in the Dunkin Donuts at the time and that none of these customers complained about the disruption and that in Dumond's view Watkins's behavior did not justify calling the police or refusing to serve him.

There is no dispute that Dunkin Donut employees were trained to work a customer into sequence if they were at a closed register, as opposed to telling them to go to the end of the line, and to ask customers at closed registers to move to an open register to place their order.  Defendant's gloss of the material facts ignores this fact.  And according to Watkins on other visits to the Old Town Dunkin Donuts he had received service from employees even though he may have been at a register that might be closed.

So with respect to this inquiry, the defendant paints Watkins as a customer in the wrong line who immediately became disgruntled, unlike any of the other customers in the Dunkin Donuts at the time.  However, Watkins has generated conflicting evidence that indicates that, in some contravention of company policy, Marshall refused to take his

order in the order that he came to the counter for service; that she had him wait for six or seven minutes before addressing him and that it was Watkins who had to initiate the service inquiry; that when Watkins actually took a place in the right register line Marshall still refused to serve him; and that Marshall was courteous to the other customers while she was unfriendly, hostile, and dismissive towards Watkins.[11]   In my opinion, there is a genuine dispute of facts material to the question of whether Caucasian customers who were similarly situated received preferential treatment in service when compared with Watkins and his son.  See Christian, 252 F3d at 879;  Slocumb, 365 F.Supp.2d at 1339-40; Solomon v. Waffle House, Inc., 365 F.Supp.2d 1312, 1325 -26 (N.D. Ga.  2004); Leach , 233 F.Supp.2d at  909 -11.[12]

        This conclusion brings me to the question under the McDonnell Douglas/Burdine burden shifting scheme of whether or not the defendant has advanced a "legitimate, nondiscriminatory reason," supported by admissible evidence, for Marshall's reaction to Watkins. McDonnell Douglas, 411 U.S. at 802; Williams, 372 F.3d at 668; T & S Serv. Associates, Inc., 666 F.2d at 726-27.  In the motion for summary judgment the defendant does not once mention the phrase, "legitimate, nondiscriminatory reason," or the term "pretext."  In its reply memorandum, responding to Watkins's framing of the inquiry, it does observe:  "Prior to shifting the burden to the defendant to establish a legitimate non-discriminatory reason for its action, the Court required the Plaintiff to prove evidence of discrimination engaged in by the store. (Def.'s Reply Pl.'s Opp'n Mot. Summ. J. at 1-

---

[11]       Obviously there is a dispute about who was responsible for the escalation of this situation, Watkins or Marshall.  However, customers cum 42 U.S.C. § 1981 plaintiffs are not required to remain docile when confronted with service refusal in order to preserve their civil rights claim.

[12]       The circumstances of customers waiting in line at a fast food establishment are in general much on par with their contemporaneous cohort than customers waiting for table service at a restaurant.  See id. at 101 ("[T]heir circumstances need not be identical, but there should be a reasonably close resemblance of facts and circumstances.").

2.)(citing <u>Hampton</u>, 247 F.3d at 1109.)  Also in this reply it does recognize Watkins's

argument  "that circumstantial evidence supports an inference of racial discrimination and

that the Defendant's explanation is a pretext for such discrimination. "  (Def.'s Reply Pl.'s

Opp'n Mot. Summ. J. at 1.)  In my view it would not be appropriate for the court to pull

out of thin air the defendants' legitimate, nondiscriminatory reason. The possibilities are

many.  <u>See</u> <u>e.g.</u>, <u>Williams</u>, 372 F.3d at 668-69 ("Staples proffers as its legitimate,

nondiscriminatory reason for rejecting Williams's check that, in light of its policy, the

sales clerk who handled Williams's attempted transaction [FN7] must have made a

mistake in refusing to accept his check."); <u>Murrell</u>, 262 F.3d at 258 ("The motel contends

that the plaintiffs were evicted because the number in their party exceeded the maximum

guest capacity for their room."); <u>Christian</u>, 252 F.3d at 879 ("Wal-Mart asserts that its

legitimate reason was that Christian was suspected of attempted shoplifting."); <u>Slocumb</u>,

365 F.Supp.2d at 1340 ("Defendant has satisfied its 'exceedingly light' burden of

producing evidence that Plaintiffs' treatment was the result of being understaffed and

busy, which is a legitimate, nondiscriminatory reason for failing to serve the Slocumbs.");

<u>Solomon</u>, 365 F.Supp.2d at 1326 ("Defendant argues that the poor service some members

of Plaintiffs' party received from Wall on April 21, 2002 resulted from Wall's mental and

physical impairments and his related inability to handle Plaintiffs' party of seven.");

<u>Callwood v. Dave & Buster's, Inc.</u>, 98 F.Supp.2d 694, 716 (D. Md. 2000) ("In response to

a properly supported prima facie case, then, Dave & Buster's argues that Countryman's

manner of service and seating policy warnings to the Callwoods are explainable by

Countryman's "legitimate[ ] concern[ ] that if other guests were prevented from sitting in

any of the unoccupied seats, she would likely lose substantial income." Dave & Buster's

also argues that Smith had a legitimate non-discriminatory reason for ejecting Chimesa Harrison, and subsequently the entire Callwood party, because he reasonably believed that Chimesa Harrison had intentionally thrown chicken bones at him and that the Callwoods' protestations were unreasonably disruptive to the decor of the restaurant.").

Even when confronted with the burden shifting standard by Watkins's memorandum opposing summary judgment, the defendant failed to provide the court with any basis for making a determination as to its rather limited burden of setting forth a legitimate, nondiscriminatory reason for Marshall's conduct.  Thus, it becomes problematical for the court to reach the third phase of the <u>McDonnell Douglas</u>/<u>Burdine</u> paradigm, determining whether plaintiff has sufficient evidence to establish that defendant's proffered reason is merely pretextual.  Instead defendant backtracks to its insistence that under its gloss of the material facts Watkins has not established a <u>prima facie</u> case because there were no similarly situated white customers.  If you believe Watkins and Dumond, Watkins presented himself for service in the open register line in a manner that was not unduly disruptive to the store, as did white customers.  Only Watkins and his son were denied service.   Accordingly, I recommend that the Court deny summary judgment on Watkins's 42 U.S.C. § 1981 and § 1982 claim.

### Maine Human Rights Act claim

Watkins's other count relies on the provision of the Maine Human Rights Act (MHRA) that bars discrimination in public accommodations.  Section 4591 of title 5 of the Maine Revised Statutes Annotated provides:  "The opportunity for every individual to have equal access to places of public accommodation without discrimination because of race, color, sex, physical or mental disability, religion, ancestry or national origin is

recognized as and declared to be a civil right." 5 M.R.S.A. § 4591. The defendant argues that this provision should be interpreted and applied in the same manner as federal anti-discrimination law citing <u>Dudley v. Hannaford Brothers Company</u>, 333 F.3d 299, 312 (1st Cir. 2003). <u>Dudley</u> stated: "It is settled law that the MHRA should be construed and applied along the same contours" as the Americans with Disabilities Act. <u>Id.</u> at 312. I do not think that it follows ineluctably that the Maine Law Court would interpret and apply this provision concerning access to public accommodations in conformity with decisions interpreting interference with the right to contract due to race under 42 U.S.C. § 1981. There is scant Maine law on this provision. However, as the defendant has premised its entitlement to summary judgment on this state law count only on an argument that as goes the federal claim so should go the Maine claim, I recommend that the Court also deny it summary judgment on this count.

### Conclusion

For the reasons stated above I recommend that Court **DENY** Lovley Development Inc.'s motion for summary judgment in its entirety.

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

Dated:  October 26, 2005